UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARGUERITE GRAY,

                Plaintiff,          Case No. 20-10099

                                            Sean F. Cox
v.                                   United States District Judge

COMMISSIONER OF                David R. Grand
SOCIAL SECURITY,              United States Magistrate Judge

                  Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 16, 19)

Plaintiff Marguerite Gray ("Gray") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (ECF No. 16; ECF No. 19) and Gray filed a reply (ECF No. 20). The Honorable Sean F. Cox referred these motions to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court recommends that the Commissioner's Motion for Summary Judgment (**ECF No. 19**) be **GRANTED**, Gray's Motion for Summary Judgment (**ECF No.16**) be **DENIED**, and that pursuant to sentence four of 42 U.S.C. § 405(g), the Administrative Law Judge's ("ALJ") decision be **AFFIRMED**.

## II.    REPORT

### A.    Background

Gray was 43 years old at the time of her alleged onset date of June 3, 2016, and at five feet tall weighed approximately 244 pounds during the relevant time. (Tr. 108). She is a high school graduate with some college courses completed, but no degree. (Tr. 32). Gray worked as an analyst performing clerical work for Blue Cross Blue Shield from 2004 through June 3, 2016 when she was laid off due to a corporate downsizing. (Tr. 41 and 71). Gray's alleged disabling conditions include diabetes, depressive disorder, fibromyalgia and lupus. (Tr. 108).

On January 6, 2017, Gray filed an application for DIB and SSI benefits, alleging disability beginning on June 3, 2016. (Tr 215). The Social Security Administration denied Gray's application on September 28, 2017. (Tr. 106). Thereafter, Gray filed a timely request for an administrative hearing, which was held on May 16, 2019, before ALJ Patrick L. MacLean. (Tr. 27-78). Gray, who was represented by attorney Andrew Cade, testified at the hearing as did vocational expert ("VE") John Stokes. (*Id.*). On July 2, 2019, the ALJ issued a written decision holding that Gray was not disabled. (Tr. 7-26). On October 11, 2019, the Appeals Council denied review. (Tr.1-3). Gray filed for judicial review of the final decision on January 14, 2020. (ECF No. 1.)

### B.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

C.     **The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Gray was not disabled under the Act.  At Step One, the ALJ found that Gray had not engaged in substantial gainful activity since June 3, 2016.  (Tr. 12).  At Step Two, the ALJ found that Gray had the following severe impairments:  "fibromyalgia [("FM")]; lupus; major depressive disorder; abdominal hernia; trochanteric bursitis at the bilateral hips; diabetes mellitus [("DM")]; and obesity."  (Tr. 12).  At Step Three, the ALJ found that Gray's impairments did not meet or medically equal one of the impairments listed in the regulations.  (*Id.*).

3

The ALJ then assessed Gray's residual functional capacity ("RFC"), concluding that Gray was capable of performing sedentary work as defined by 20 C.F.R. § 404.1567(a) and 416.967(a) with the following limitations:

> [T]he claimant is limited to lifting and carrying up to 10 pounds occasionally; no ladders, ropes, scaffolds; could occasionally climb ramps, and stairs; occasionally balance, stoop, kneel, crouch, and crawl; can frequently handle objects bilaterally; avoid concentrated use of hazardous moving machinery; avoid all exposure to unprotected heights; limited to simple routine and repetitive tasks, performed in a work environment free of fast-paced production requirements; involving only simple, work-related decisions; and with few, if any, workplace changes.

(Tr. 14).

At Step Four, the ALJ found that Gray was not capable of performing her past relevant work as an accounting clerk due to her limitation to unskilled work.  (Tr. 18-19).  At Step Five, the ALJ stated, based in part on the VE's testimony, that Gray was capable of performing a significant number of jobs in the national economy including escort vehicle driver, credit card clerk, and document preparer.  (Tr. 19).  As a result, the ALJ concluded that Gray was not disabled under the Act.  (Tr. 20).

### D.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations

omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### E.    Analysis

Gray's main argument is that the ALJ's RFC is not supported by substantial evidence. (ECF No. 16, PageID.842.)  Gray contends that the ALJ provided an insufficient explanation as to why he found Gray capable of sedentary work.  (*Id*. at PageID.844) (citing *Charbonneau v.*

5

*Comm'r of Soc. Sec.*, 2019 WL 960192, at *17 (E.D. Mich. Jan. 11, 2019).  Gray also argues that the ALJ did not explain what elements of the medical opinion of state agency examining physician Dr. Diane Manos he gave "some weight" in finding Gray capable of sedentary work.  (*Id.* at PageID.846.)  Second, Gray claims that the ALJ did not properly analyze her obesity and fibromyalgia.  (*Id.* at PageID.847-50.)  Lastly, Gray argues that the ALJ did not properly consider her full mental health record, and the reasons for her inconsistent compliance with medications. (*Id.* at PageID.850-54.)

The Commissioner responds by arguing that "the ALJ provided a logical explanation" for his RFC as required by *Charbonneau*.  (ECF No. 19, PageID.881.)  The Commissioner also argues that the ALJ followed the relevant regulations in assessing Dr. Manos's medical opinion. (*Id.* at PageID.887.)  In addition, the Commissioner points out that Gray used outdated listings in her argument regarding the ALJ's alleged inadequate assessment of her obesity.  (*Id.* at PageID.889.) The Commissioner also argues that the ALJ properly considered Gray's fibromyalgia and the fact that her symptoms could "wax and wane."  *See Lucas v Comm'r of Soc. Sec.*, No. 18-10087, 2019 WL 1117927, at *2 (E.D. Mich. Feb. 21, 2019)(reasoning that a person with fibromyalgia can have symptoms that "wax and wane.").  Finally, the Commissioner argues that the ALJ properly considered the medical evidence regarding her mental impairments and inconsistent compliance with medications.  (*Id.* at PageID.894-97.)

The Court has thoroughly reviewed the transcript, including Gray's medical record, Function and Disability Reports, and testimony as to her conditions and resulting limitations.  The Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

### 1. Legal Standards as to RFC

A claimant's RFC is defined as "the maximum degree to which [she] retains the capacity for sustained performance of the physical-mental requirements of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).[1] "In formulating a residual functional capacity, the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions."  *Eslinger v. Comm'r of Soc. Sec.*, 476 Fed.Appx. 618, 621 (6th Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(3)).  The ALJ must also take into consideration "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Moreover, an RFC is not supported by "substantial evidence" if it is the product of a selective discussion of the evidence that does not adequately demonstrate that the ALJ fairly weighed the competing record evidence.  "'Substantiality of the evidence must be based upon the record taken as a whole.  Substantial evidence is not simply some evidence, or even a great deal of evidence.  Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  *Trudell ex. Rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) (quoting *Garner*, 745 F.2d at 388).

### 2. The ALJ's Analysis is Supported by Substantial Evidence

#### a. Substantial Evidence Supports the ALJ's RFC for Sedentary Work

As stated above, Gray's main argument is that the ALJ's finding that she has the RFC for

---

[1] *See also*, Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996) (a claimant's RFC represents his ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule").

sedentary work is not supported by substantial evidence.  (ECF No. 16, PageID.842.)   This argument lacks merit.

Gray alleges that in limiting her to sedentary work, the "ALJ merely summarized some of the medical history followed by a conclusory statement that 'the above residual functional capacity assessment is supported by the claimant's objective imaging and clinical exam findings, which showed some tender points, but largely normal strength and functional range of motion'" and "one additional sentence explaining his rationale as to why he found Plaintiff capable of sedentary work, stating: 'a limitation to sedentary work is also more consistent with the claimant's allegations as to difficulty standing and no complaints as to sitting for long periods playing video games or watching television.'"  (ECF No. 16, PageID.843-44) (citing Tr. 18).  However, a fair review of the ALJ's RFC analysis shows that his RFC determination is the product of a thorough review of the record.  (Tr. 15-18).

First, the ALJ correctly noted that Gray's own function report contradicted her hearing testimony in certain respects, and indicated that she was capable of a wide variety of activities of daily living ("ADL") including personal care and hygiene, child care, transporting her children to school, helping with homework, attending appointments, and managing money.  (*Compare* Tr. 16 with Tr. 279-287).  The ALJ also appropriately noted that in her function report Gray "indicated she is also able to enjoy reading, watching television, and playing video games, suggesting an ability to sustain focus for multiple hours at a time."  (Tr. 16, 284).[2]

Next the ALJ provided a detailed review of the medical evidence, and concluded that the clinical evidence showed no functional limitations that would require an RFC different than the one he adopted.  For example, the ALJ noted that immediately prior to her alleged onset date,

---

[2] Gray also reported that she "will vaccuum [sic] and wash dishes when [] not hurting.")  (Tr. 282).

Gray's "clinical exams noted largely normal findings, including full musculoskeletal range of motion and ability to walk on heels and toes." (Tr. 16, 352-56 (no myalgias, full back range of motion, walking for exercise,[3] no depression or anxiety, normal musculoskeletal exam, full range of motion in extremities, normal gait). After noting a fairly lengthy period where Gray did not seek any relevant treatment, the ALJ evenly noted that on several occasions, "[h]er clinical exam was fully normal, indicat[ing] no tenderness or limitation at any area," while at other times (and sometimes even on the same date) some clinical exams showed tenderness of the lumbar and cervical spine (Tr. 17, 629-40, 674-709) For example, the ALJ noted her July 3, 2017 appointment where, despite noting 14/18 tender points, Gray's doctor also found that she had a normal range of motion in her cervical and lumbosacral spine, full range of motion in her hips, no tenderness in her knees, full range of motion in her shoulders, and no tenderness or swelling in her wrists. (Tr. 17, 545). The ALJ noted that in August 2018, Gray's examination revealed "occasional tenderness at the lumbar spine without focal points" and "some limited range of motion," but that Gray also reported experiencing "zero pain," and overall had "largely normal findings" with "5/5 strength" in both of her arms. (Tr. 17, 629-30.) Her doctor scheduled her to return only on an as needed (PRN) basis. (Tr. 630). In short, the ALJ acknowledged and weighed evidence that was supportive of Gray's claims and that which supported a finding that she was not disabled. It is for the ALJ and not this Court to engage in that type of weighing of the evidence. *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) ("Our task is not to reweigh the evidence. That is solely the province of the [Commissioner].").

After this thorough review, the ALJ addressed the opinion evidence from the state agency

---

[3] Contrary to this medical record, Gray testified at the hearing that she "can't really make it down [her] block" walking. (Tr. 60).

doctor, Dr. Diane Manos, MD.  (Tr. 18).  "An ALJ is permitted to rely on state agency physicians'
opinions to the same extent as he may rely on opinions from other sources."  *Reeves v. Comm'r of
Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015).  Indeed, opinions from non-examining state
agency consultants "may be entitled to significant weight, because these individuals are 'highly
qualified' and are 'experts in Social Security disability evaluation.'"  *Cobb v. Comm'r of Soc. Sec.*,
No. 12-2219, 2013 WL 5467172, at *5 (N.D. Ohio Sept. 30, 2013) (quoting 20 C.F.R. §§
404.1527(e)(2)(i), 416.927(e)(2)(i)).  "'In appropriate circumstances, opinions from State agency
medical and psychological consultants … may be entitled to greater weight than the opinions of
treating or examining sources.'"  *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir.
2013) (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  This is especially so
when the state agency physician has reviewed the entire record and there is no other opinion
evidence, as is the case here.  *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir.
2016).

Among other limitations, Dr. Manos found that Gray could occasionally lift and carry up
to 20 pounds and frequently lift and carry up to 10 pounds, that she could stand/walk a total for a
total of 2 hours (with normal breaks), and sit for a total of 6 hours in an 8-hour workday.  (Tr. 118).
ALJ MacLean gave "some weight" to Dr. Manos' opinion in formulating Gray's RFC, but
explained, "however, I find that [Gray's] 14/18 tender points would support a limitation to
sedentary work.  A limitation to sedentary work is also more consistent with [Gray's] allegations
as to difficulty standing and no complaints as to sitting for long periods playing videogames or
watching television."  (Tr. 18).  The ALJ's analysis thus recognized that although Dr. Manos'
standing/walking limitations were consistent with sedentary work, the 20-pound lifting limitations
she imposed exceeded the 10-pound lifting requirements of sedentary work.  The ALJ explained

that, for the reasons he had previously discussed (and which the Court addressed above) the *more restrictive limitation* was warranted. Indeed, immediately after his decision to render an RFC more restrictive than the one suggested by Dr. Manos, the ALJ summarized his analysis, explaining, "the above residual functional capacity assessment is supported by [Gray's] objective imaging and clinical exam findings, which showed some tender points, but largely normal strength and functional range of motion. It is also supported by [Gray's] inconsistent compliance with recommended medication." (*Id.*) Gray has not identified any restriction in the record more limiting than those imposed by the ALJ.

For all of these reasons, Gray's characterization of the ALJ's RFC analysis is inaccurate, and the ALJ's RFC determination is supported by substantial evidence in the record.

> b.   *Substantial Evidence Supports the ALJ's analysis of Gray's Obesity*

With regard to Gray's obesity, the ALJ wrote:

> The claimant is described as obese, needing weight reduction and was considering weight loss surgery. (Exhibit 18F; 20F, p.12). Accordingly, pursuant to SSR 19-2p, the undersigned has considered obesity as an aggravating factor to her other severe impairments. The undersigned has considered that obesity can cause or contribute to impairments in the musculoskeletal, endocrine, respiratory and cardiovascular system.

(Tr. 18).

SSR 19-2p states:

> Obesity is not a listed impairment; however, the functional limitations caused by the [medically determinable impairment ("MDI")] of obesity, alone or in combination with another impairment(s), may medically equal a listing. For example, obesity may increase the severity of a coexisting or related impairment(s) to the extent that the combination of impairments medically equals a listing.
>
> **We will not make general assumptions about the severity or functional effects of obesity combined with other impairment(s).** Obesity in combination with another impairment(s) may or may not increase the

11

severity or functional limitations of the other impairment.  ***We evaluate each case based on the information in the case record.***

SSR 19-2p, www.ssa.gov/OP_Home/ruli . . .SR2019-02-di-01.html (emphasis added).

Notably, there is no medical evidence in the record indicating that Gray's obesity increases the severity of her functional limitations or other impairments.  Indeed, Gray has not indicated how her obesity increases the severity or functional limitations of her other impairments.  Nor has she indicated how her obesity should be further accounted for in her RFC.  Given this, the ALJ has complied with the relevant regulations regarding obesity by further limiting her RFC with exceptions to the sedentary level of work such as: no climbing of ladders, ropes or scaffolds; only occasional climbing of ramps or stairs; only occasional balancing, stooping, kneeling, crouching or crawling; no concentrated use of hazardous moving machinery; and no exposure to unprotected heights.  (Tr. 14).  These exceptions account for the ALJ's finding that Gray's "obesity can cause or contribute to impairments in the musculoskeletal, endocrine, respiratory and cardiovascular system."  (Tr. 18).  As such, substantial evidence supports the ALJ's RFC with regard to obesity. *See Essary v. Comm'r of Soc. Sec.*, 114 F. Appx. 662, 667 (6th Cir. 2004)(holding that the ALJ correctly considered the impact of a claimant's obesity by acknowledging that obesity "can reasonably be expected to result in some degree of functional physical and metal limitations," in "[t]he absence of further elaboration of the issue" because the claimant "failed to present evidence of any functional limitations resulting specifically from her obesity.").

        c.      *Substantial Evidence Supports the ALJ's analysis of Gray's Fibromyalgia*

Gray argues that the ALJ did not properly address her fibromyalgia because he selectively relied on evidence of "largely normal strength and functional range of motion."  (ECF No. 16, PageID.848.)  She also states that it was improper for the ALJ not to even mention the relevant

regulations regarding fibromyalgia.  (*Id*. at PageID.849.)

Notably, fibromyalgia in not a listed impairment.  *See* SSR 12-2p, 2012 WL 3104869, at *6.  Indeed, the relevant regulation on considering fibromyalgia in crafting an RFC states:  "For a person with FM, we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'"  *See id*.  The ALJ has no obligation to cite the regulation he uses to assess fibromyalgia.  *See id*.  He must simply comply with the regulation.  *See id*.

The Court finds ALJ MacLean complied with the regulation in this case when he analyzed Gray's longitudinal record in his decision, citing evidence of both when the symptoms waxed and when they waned.  (Tr. 16-17).  Indeed, much of the Court's analysis above addresses this issue. To the extent Gray argues that the ALJ failed to consider the debilitating fatigue caused by her fibromyalgia, that argument also lacks merit.  (ECF No. 16, PageID.849.)  The ALJ explicitly noted that Gray "experiences flares on a recurrent basis with [a] period of fatigue after each flare for a number of days."  (Tr. 15).  There is no other information from a medical source opining as to how her fatigue affects her functional limitations or her ability to perform work on a sustained basis.  Nor has she established how her fatigue should be further accounted for in her RFC.  There is also no evidence in the record indicating that Gray would be off task for a certain amount of time each day or would be absent a certain amount of days a month due to fatigue.  The ALJ noted that Gray "indicated she is also able to enjoy reading, watching television, and playing video games, suggesting an ability to sustain focus for multiple hours at a time."  (Tr. 16, 63).  The Court also notes that although Gray indicated she was experiencing challenges at work towards the end of her tenure, she stopped working only when she was laid off due to her department being downsized, not because she resigned her position due to an inability to work.  (Tr. 41).

Finally, the ALJ adopted a very restrictive RFC, limiting Gray's exertional level to sedentary work involving only simple, routine and repetitive tasks, performed in a work environment free of fast-paced production requirements. *See Taylor v. Comm. Soc. Sec.*, No. 10-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011), adopted by 2011 WL 2682892 (E.D. Mich. July 11, 2011)(discussing that time off task can be encompassed by a limitation to simple, routine work).

For all of these reasons, Gray's argument that the ALJ did not properly address her fibromyalgia lacks merit.

        *d.*    *Substantial Evidence Supports the ALJ's analysis of Gray's Mental Health Record and Mental RFC*

Gray argues that the ALJ did not properly consider her full mental health record in analyzing her RFC.  (ECF No. 16, PageID.850-54.)  While the ALJ could have been more explicit about his consideration of certain aspects of the record, overall, his decision makes clear that he considered the salient records, and that the mental limitations incorporated in the RFC are supported by substantial evidence.

First, the ALJ accurately noted that Gray "did not begin any specialized mental health treatment until June 2017," which is about a year after her alleged onset date, and that her exams from June 2017 forward were "largely normal."  (Tr. 18, 50-51, 601-02, 622-23, 748-49).

Second, although the ALJ did not specifically reference the mental RFC findings in the state agency evaluation, he did state that he reviewed the "state agency opinion evidence," which, as it relates to Gray's mental limitations, found that she was capable of performing "simple, routine, unskilled work activity," as she was "not significantly limited" in her ability to: "carry out very short and simple instructions;" "sustain ordinary routine without special supervision;" "make simple work-related decisions;" and "complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (Tr. 18, 120-21).  Those findings are consistent with the relevant portions of the RFC adopted by the ALJ, including that Gray was "limited to simple routine and repetitive tasks, performed in a work environment free of fast-paced production requirements; involving only simple, work-related decisions; and with few, if any, workplace changes."  (Tr. 14).

Third, the ALJ evenly discussed the May 22, 2017 consultative examination performed by L. Imasa, M.D., explaining:

> At her consultative exam, [Gray] presented with a generally normal mental status examination, making only some errors with recent memory testing, but was able to recall information and complete simple calculations.  The examiner assessed major depressive disorder with anxious stress and noted that the claimant presented with signs and symptoms of depression and anxiety since childhood, with health problems which makes it difficult for her to function like she used to which adds to her depression.  She was observed to be very emotional and crying during the evaluation.  She was cooperative.  She was able to relate and give information.  She was oriented times three but she did have some minor problems with focus and concentration.

(Tr. 18; *see also* Tr. 478-80).

The ALJ explained that he gave the assessment "some weight as it is vague as to functional limitations, but the assessment of only minor problems in focus and concentration is consistent with [Gray's] largely normal mental status examination with minor errors and her lack of mental health treatment through this point."  (*Id.*)  This was a fair review of the consultative exam, which did not impose any specific functional limitations, and noted that Gray was "in fairly good contact with reality," that "[s]he responded to questions spontaneously . . . [and] was quite talkative but not pressured in her speech," and that although she "described signs and symptoms of depression and anxiety [] [she made] no reports of any hallucinations, delusions, or obsessions."  (Tr. 479).

15

Gray has not shown how the assessed "minor problems with focus and concentration" on this occasion should have translated into any specific RFC limitation greater than those imposed by the ALJ.  Indeed, in addition to the evidence discussed above, the ALJ identified other evidence which supported not including any greater mental RFC limitations, including that Gray's activities, such as playing video games and reading, "suggest[] an ability to sustain focus for multiple hours at a time."  (Tr. 16).

Finally, the Court notes that Gray testified that the main challenge she faced at her old job was that it was "high pressure" and stressful in that she had to "make numbers," and that after being laid off she began looking for "different" work.  (Tr. 69-70).  But the ALJ reasonably addressed those concerns by adopting an RFC that limited Gray to "simple routine tasks, performed in a work environment *free of fast-paced production requirements*; involving *only simple, work-related decisions*; and with few, if any, workplace changes."  (Tr. 14) (emphasis added).  Again, Gray has not shown that any greater limitations are warranted.

Gray also argues that the ALJ improperly weighed various Global Assessment Functioning ("GAF") exam scores in the record.  On January 28, 2016, Dr. Sarah Zamari of Henry Ford Behavioral Health Services assessed Gray with a GAF of 60, with her highest GAF in the last 12 months being 65.  (Tr. 336).  On July 14, 2017, Dr. Usha Sudindrahath assessed Gray with a GAF score of 48.  (Tr. 624).  With regard to these scores, the ALJ wrote:

> As to the claimant's mental health treatment, she treated with Lincoln Behavioral Services from June 2017 through January 2019.  Her clinical exams throughout this periods [sic] were largely normal, noting only that the claimant was distractible on one occasions, [sic] had flight of ideas, and a depressed/irritable mood.  Nonetheless, it was noted the claimant is able to meet basic needs and was functioning adequately with treatment.  The claimant was assessed a GAF score of 48.  The claimant also consistently denied hallucinations, paranoid fears, suicidal or homicidal ideas and no side effects are noted.  (Exhibit 15F; 21F).  Overall, the records do not support the noted GAF of 48, and are more consistent with the previously

16

assessed GAF score of 65.  Accordingly, limited weight is given to the GAF score within the record as GAF scores do not correlate to any scale used by Social Security and represent only a snapshot of the claimant's condition at a particular time.

(Tr. 18).

In challenging the ALJ's handling of the GAF scores, Gray argues:

The ALJ stated "the records do not support the noted GAF of 48, and are more consistent with the previously assessed GAF score of 65." (R.18). But this statement is disconnected from any logic.  Plaintiff was assessed with GAF scores of 65 *prior to her onset date* when her symptoms were less severe, with a PHQ-9 score indicative of mild depressive symptoms and a GAD-7 score indicative of moderate anxiety symptoms. (R.337, 346). She was not having crying spells during this time either. (R.334, 342). Conversely, during the relevant period, when she began more consistent mental health treatment, she was consistently assessed with a GAF of 48, consistent with PHQ-9 scores indicative of moderate to moderately-severe depression, an episode where she broke down crying during a therapy session, a tearful presentation at a rheumatology follow up, ongoing mood swings, panic attacks, reports of crying spells every few days, hyperverbal presentation, racing thoughts, flights of ideas, embarrassed and depressed presentations, and irritable affect. (R.622, 690, 717, 719, 721, 736, 737). This is not indicative of the same level of function as existed prior to her onset date.

(ECF No. 16, PageID.850-851).

Gray's argument lacks merit.  First, Gray fails to appreciate that, as the ALJ recognized, GAF scores, on their own say nothing about any particular functional limitation a claimant may have, at least not on any long-term basis.  The GAF exam "is a scoring system that mental health professionals use to assess how well an individual is functioning in their daily lives."  *See* www.healthline.com/health/gaf-score.  The Sixth Circuit has held that while a GAF may be of "considerable help," it is not "essential" to determining an individual's residual functional capacity.  *See Kornecky v. Comm'r Soc. Sec.*, No. 04-2171, 2006 WL 305648, at *13-*14 (6th Cir. Feb. 9, 2006).  Moreover, the Commissioner "has declined to endorse the GAF score for use" in assessing disability.  *See DeBoard v. Comm'r of Soc. Sec.*, 211 F. Appx. 411, 415 (6th Cir. 2006).

17

Gray does not identify any particular limitation that the ALJ would have been required to adopt had he credited her 48 GAF score.

Second, Gray's argument rests mostly on her own subjective reports to her treaters – which the ALJ reasonably discounted, *see supra* at 8 – while ignoring that their evaluations typically found her mental status to be normal.  (Tr. 601-02, 622-23, 687, 748-49).  As the Court has noted, it is for the ALJ, not this Court to weigh the evidence.  *See Mullins*, 680 F.2d at 472.

For all of these reasons, the Court sees no error in the ALJ's handling of Gray's mental impairments.

   e.   *Substantial Evidence Supports the ALJ's analysis of Gray's noncompliance with prescription medicine*

Last, Gray claims that the ALJ "failed to explore any possible reasons for noncompliance" with her medications.  (ECF No. 16, PageID.853.)

SSR 16-3p states:

> We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities . . . . Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.
>
> In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.  We will not find an individual's symptoms inconsistent with the evince in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

SSR 16-3p, 2016 WL 1119029, at *8 (March 16, 2016).

In the case at bar, the ALJ's decision references Gray's failure to comply with prescribed treatment.  For example, the ALJ noted that Gray: (1) stopped taking her lupus medication; (2) repeatedly declined to take the Lyrica she had been prescribed; (3) despite complaining of bodily pain, she had stopped taking Plaquenil in October 2017; and (4) declined to start insulin after it was prescribed to her.  (Tr. 15-17).  None of these references was erroneous, and contrary to Gray's argument, the Commissioner did note Gray's concern that Lyrica would cause her to suffer "side effects" and that the Lupus medication may cause cancer.  (Tr. 15, 17).  As to the Lyrica, the ALJ correctly found that there was "no indication [Gray] ever took this medication, and that notwithstanding Gray having expressed her concerns, her doctors continued to prescribe that medication."  (Tr. 17, 629, 674, 684, 688).

In short, this is not a situation in which the ALJ unreasonably discredited a claimant for not taking prescribed medication.  For one, the ALJ's thorough decision makes clear that he did not put undue weight on this issue, and that his decision is a product of a wholistic review of the record evidence.  Moreover, the same records which reflect Gray's decision not to take Lyrica also indicate that she was doing well both mentally and physically at the time.  (*E.g.*, Tr. 629-630, 686-89.)  In other words, even if Gray reasonably declined to take the Lyrica out of concern for the side effects it *might* cause her, that decision would be consistent with the related treatment records that support the ALJ's analysis as to the severity of her symptoms.  For all of these reasons, nothing about the ALJ's discussion of Gray's failure to take certain medications as prescribed warrants remand.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence and should be affirmed.

### III.    CONCLUSION

For the reasons set forth above, the Court recommends that the Commissioner's Motion for Summary Judgment (**ECF No. 19**) be **GRANTED**, Gray's Motion for Summary Judgment (**ECF No.16**) be **DENIED**, and that pursuant to sentence four of 42 U.S.C. § 405(g), the Administrative Law Judge's ("ALJ") decision be **AFFIRMED**.

Dated: January 11, 2021                       s/David R. Grand
Ann Arbor, Michigan                       DAVID R. GRAND
                                          United States Magistrate Judge


### <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 11, 2021.

s/Eddrey Butts
EDDREY BUTTS
Case Manager